UNITED STATES of America, Plaintiff,

v.

**Mohammad AL–AHMAD, Defendant.**

**No. 97–1433M.**

United States District Court,
D. Colorado.

March 6, 1998.

Martha Paluch, Asst. U.S. Atty., Denver, CO, for U.S.

Sean Soon, Denver, CO, for Defendant.

## MEMORANDUM OPINION AND ORDER

BORCHERS, United States Magistrate Judge.

THIS MATTER came before the Court on March 4, 1998 for a preliminary hearing. Present were the following: Martha Paluch, Assistant United States Attorney; Sean Soon, attorney for Defendant; and Defendant. The Court heard the testimony of Special Agent Scott D. Eicher of the Federal Bureau of Investigation. The matter then was taken under advisement.

### I.

A criminal complaint was filed with this Court on June 4, 1997 charging Defendant with violation of 18 U.S.C. § 1204(a). This charge is denominated as "International Parental Kidnapping", and provides for a penalty of up to three years imprisonment and a fine of up to $250,000. A warrant was issued for the arrest of Defendant by United States Magistrate Judge James Robb of this Court.

Defendant was arrested at O'Hare International Airport in Chicago, Illinois on February 12, 1998. He appeared before a Magistrate Judge in the United States Court for the Northern District of Illinois and waived an identity hearing. He then was transported to this District.

The Court held a preliminary hearing on March 4, 1998 pursuant to Fed.R.Crim.P.5.1. That Rule provides, in part, as follows:

(a) Probable Cause Finding. If from the evidence it appears that there is proba-

ble cause to believe that an offense has been committed and that the defendant committed it, the federal magistrate judge shall forthwith hold the defendant to answer in district court. The finding of probable cause may be based upon hearsay evidence in whole or in part. The defendant may cross-examine adverse witnesses and may introduce evidence . . . . .

(b) Discharge of Defendant. If from the evidence it appears that there is no probable cause to believe that an offense has been committed or that the defendant committed it, the federal magistrate judge shall dismiss the complaint and discharge the defendant. The discharge of the defendant shall not preclude the government from instituting a subsequent prosecution for the same offense.

All reasonable inferences must be drawn in favor of the prosecution at a preliminary hearing.

## II.

The evidence presented to the Court from the testimony of Special Agent Eicher, the affidavit of SA Eicher, and documents establishes the following. Defendant is the father of the minor child Brittny Collins (Brittny). The child was born out of wedlock on September 18, 1985. The mother of the child, Christy Farrell, showed little interest in the child after her birth.

In June, 1990, Defendant filed a petition for declaration of parentage under the Uniform Parentage Act (UPA) in the Jefferson County District Court. *See,* Colo.Rev.Stat. § 19–4–101, et seq. This was assigned case number 90JP146. Named as respondents in that action were the natural mother, Christy Farrell, and Leslie P. Collins–Pottebaum, maternal grandmother of the child. The maternal grandmother had filed a separate petition for custody that was included in the same case number. *See,* Colo.Rev.Stat. § 14–10–123(1)(c). It appears that the child had resided with the maternal grandmother for a good portion of the child's early life.

On December 11, 1992, Judge Michael C. Villano entered a written order resolving all matters related to the parentage act case. He described the proceedings as "heated,

bitter and of long duration and frequently without regard for the well-being of Brittny." Judge Villano further stated that "[w]hichever petition the Court grants assures that Brittny will suffer in the short term or long term as hereinafter explained."

Defendant legally was declared the father of Brittny through his petition. Judge Villano awarded custody of Brittny to Defendant, with visitation as follows:

2. That the respondent-mother and respondent-grandmother shall have liberal and reasonable rights of visitation with Brittny on reasonable notice to the petitioner.

In response to a motion for change of custody filed by the maternal grandmother, Judge Villano held another hearing on April 23, 1993. Although it is unclear from the transcript provided to this Court whether Defendant was present at that hearing, he was represented by counsel, Marilyn Wilde. At the conclusion of the proceedings, Judge Villano denied the motion for change of custody and entered several orders on the record, including the following:

I would also, and I've already made one order, that the child not be taken out of the State of Colorado on a permanent basis without the permission of the Court.

On July 3, 1996, Defendant advised the maternal grandmother that he was taking Brittny to Disneyland on vacation. On July 29, 1996, Defendant contacted the maternal grandmother by telephone and advised her that he was in Amman, Jordan with Brittny. Defendant is a native of Jordan, but apparently has received United States citizenship through naturalization. It is not disputed that Defendant has family members who reside in Jordan.

The maternal grandmother did not see Brittny nor did she have any visitation with her. It is not disputed that Defendant did not seek permission from Judge Villano to remove Brittny from the State of Colorado on a permanent basis. The maternal grandmother then sought a change of custody.

On March 11, 1997, Judge Villano issued an order changing permanent custody of Brittny to the maternal grandmother. Judge

Villano specifically found that Defendant had violated the previous order prohibiting removal of Brittny from Colorado. The oral order on the record was reduced to writing on March 21, 1997.[1] Shortly thereafter, a criminal information was filed in Jefferson County charging Defendant with violation of a custody order. *See,* Colo.Rev.Stat. § 18–3–304.

The reasonable inferences from the evidence substantiate the following. First, the child Brittny is living in Amman, Jordan and has been there since July, 1996. Second, the maternal grandmother was granted visitation rights up to and including March, 1997. Third, Judge Villano changed custody of Brittny to the maternal grandmother on March 11, 1997. Fourth, Defendant has not returned custody of Brittny to the maternal grandmother in compliance with the order of Judge Villano.

## III.

Defendant has been charged with a violation of 18 U.S.C. § 1204 which reads, in part, as follows:

International parental kidnapping.

(a) Whoever removes a child from the United States or retains a child (who has been in the United States) outside the United States with intent to obstruct the lawful exercise of parental rights shall be fined under this title or imprisoned not more than 3 years, or both.

(b) As used in this section—

(1) the term "child" means a person who has not attained the age of 16 years; and

(2) the term "parental rights," with respect to a child, means the right to physical custody of the child—

(A) whether joint or sole (and includes visiting rights); and

(B) whether arising by operation of law, court order, or legally binding agreement of the parties.

The evidence before the Court indicates that Defendant denied visitation to the maternal

grandmother in 1996 and early 1997. The child Brittny was not returned to the maternal grandmother in response to Judge Villano's order of March 11, 1997. No evidence was presented at the hearing that the mother, Christy Farrell, attempted to exercise any visitation rights during 1996 or 1997.

In order to make a finding as to establishment of probable cause, the Court must first determine whether the term "parental rights," as set forth in § 1204(a), includes the right of a grandparent to visit and/or an award of sole custody of child to a grandparent. Counsel provided argument to the Court, but did not provide any case authority.

From this Court's research, there appears to be only one reported case dealing with the crime of International Parental Kidnapping, as charged under § 1204. *See, United States v. Amer,* 110 F.3d 873 (2nd Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 258, 139 L.Ed.2d 185 (1997). In that case, the defendant was a native of Egypt. He emigrated to the United States and lived in Queens, New York. His wife and first child came to the United States to join him. Two other children were born while the family lived in New York. At some point, the defendant left the United States with the three children and returned to Egypt. He left the children with the paternal grandmother and then returned to this country.

The defendant in *Amer* was charged with parental kidnapping, as he had removed the children from this country with the intent of disrupting the parental rights of the mother. The defendant was convicted, even though he had raised several legal challenges to the statute and indictment. The Second Circuit upheld the conviction. The defendant had argued that the statute was unconstitutionally vague. The court of appeals disagreed. The court ruled, in part, as follows:

Finally, Ahmed's argument as to the clarity of the phrase "parental rights" fails because Congress made clear in the legislative history of the Act that "parental

---

1. It is unclear how Defendant had notice of the hearing on March 11, 1997. The district court's order was sent to an address where Defendant clearly did not live. Notice of the change of custody is immaterial for purposes of the preliminary hearing. It will not be immaterial at trial.

rights" are to be determined by state law, in accordance with the Hague Convention ..." H.R.Rep. No. 103–390, at 4 (1993), reprinted in 1993 U.S.C.C.A.N. 2419, 2422 ("House Report"). Article 3 of the Hague Convention provides that parental rights are to be defined by "the law of the State in which the child was habitually resident immediately before removal or retention." Art. 3(a), Hague Convention, opened for signature Oct. 25, 1980, 19 I.L.M. 1501, T.I.A.S. No. 11670 (1980) (entered into force for the United States, July 1, 1988) see Merritt L. McKeon, International Parental Kidnapping: A New Law, a New Solution, 30 Fam.L.Q. 235, 240 (1996). Although the concept of the state of "habitual residence" might be unclear at the margins, there is no doubt that, in this case, New York is that place. At the time of their abduction, Amachmud had resided in New York for eight years, Maha and Omar had lived in New York since their birth. Moreover, there is no confusion under New York law that Mona, as the biological mother, enjoys the right to physical custody of her children unless and until this right is terminated by law. (cit.omitted). *Id.* at p. 878. As the Second Circuit noted, defendant's conduct clearly violated the letter and spirit of the law, as the children's departure from the United States was a direct attempt to prohibit the mother from having contact with her sons and daughter.

■ Review of the legislative history of § 1204 does indicate that state law is to be examined, as contemplated by the Hague Convention on the Civil Aspects of International Parental Child Abduction (Hague Convention). Brittny was born in Colorado and had resided her entire life in this state before her departure to Jordan. Defendant had availed himself of legal remedies under the Uniform Parentage Act to secure a declaration of his parentage and to obtain custody. Thus, the law of Colorado must be examined as to whether "parental rights" can be construed to include visitation granted to a grandparent and/or custody granted to a grandparent.

Defendant filed his petition in 1990 under the Uniform Parentage Act to establish that he was the father of Brittny. Since Defendant was not married to the mother at the time of the birth and no presumption of parentage existed, this was the appropriate means to establish parentage. *R.McG. v. J.W.,* 200 Colo. 345, 615 P.2d 666 (1980). Parties to a parentage act case include the child and natural parents, plus any state agency providing support. *People in the Interest of A.A.T.,* 191 Colo. 494, 554 P.2d 302 (1976). It is unclear how the maternal grandmother was named as a respondent in the parentage act case, but it appears that she was made a party based upon her physical custody of the child and fact that she had filed a petition for custody pursuant to Colo. Rev.Stat. § 14–10–123.

The Uniform Parentage Act does provide for issuance of an order of custody and for visitation (now called parenting time) for the non-custodial parent. Colo.Rev.Stat. § 19–4–116(3)(a). Likewise, Colo.Rev.Stat. § 14–10–123 does not specifically provide for visitation if a custody order is issued. Grandparents do have the statutory right to seek visitation rights with a grandchild. Colo. Rev.Stat. § 19–1–117. Such a right applies in a Uniform Parentage Act case. *F.H. v. K.L.M.,* 740 P.2d 1006 (Colo.App.1987).

■ This Court finds that under Colorado law visitation rights of a grandparent are limited. *See, In Re Oswald,* 847 P.2d 251 (Colo.App.1993). Further, such a right cannot be equated with the right to visit by a natural parent. The right of a grandparent to visit is purely statutory and is not subject to a criminal prosecution if the order of visitation is ignored. Colo.Rev.Stat. § 19–1–117.5; Colo.Rev.Stat. § 18–3–304. This Court finds that denial of visitation rights to a grandparent under Colorado law could not trigger any violation of § 1204.

■ On March 11, 1997, Judge Villano ordered a change of custody to the maternal grandmother. This was pursuant to Colo. Rev.Stat. § 14–10–123 and § 14–10–131. The maternal grandmother was able to seek custody initially through § 123. Custody was granted to Defendant, but the court maintained the ability to change custody pursuant to § 131. *See generally, In Re Custo-*

*dy of C.C.R.S.,* 872 P.2d 1337 (Colo.App. 1993), aff'd, 892 P.2d 246 (Colo.1995). A person awarded permanent custody becomes for all practical purposes "a parent." The legal custodian has a duty to care for a child, providing basic necessities of life. The legal custodian has such rights to the exclusion of the natural parent/s. *Id.*

In addition, the Colorado General Assembly has strengthened the position of a custodian through criminal sanctions for violation of a custody order.

(2) Any parent or other person who violates an order of any district or juvenile court of this state, granting the custody of a child under the age of eighteen years to any person, agency, or institution, with the intent to deprive the lawful custodian of the custody of a child under the age of eighteen years, commits a class 5 felony.

Colo.Rev.Stat. § 18–3–304. The status as "custodian" is tantamount to that of a parent, as a parent may be charged criminally for violating a custody order, if there is intent to deprive the custodian of custody of a child.

Based upon the above, this Court finds as follows. Judge Villano made a judicial determination that Defendant no longer was the appropriate person to be custodian of the child Brittny. On March 11, 1997, the maternal grandmother became the legal custodian of Brittny, to the exclusion of the parental rights of Defendant. Under Colorado law, the maternal grandmother became "a parent" for all legal purposes, as well as being a parent under § 1204.

Defendant had a duty to advise the Jefferson County District Court of his whereabouts. That court maintains jurisdiction over Brittny until her emancipation. *In Re Hartley,* 886 P.2d 665 (Colo.1994). All reasonable inferences from the evidence indicate that Defendant knew or should have known the maternal grandmother would seek a change in custody, if the child was removed permanently from Colorado. That occurred, and Defendant then had a duty to comply with the order changing custody. Defendant did not do so. Probable cause exists to find that Defendant violated 18 U.S.C. § 1204 on or after March 11, 1997.

IT IS HEREBY ORDERED that a finding of probable cause is entered, as the Court has determined the evidence establishes that Defendant violated the provisions of 18 U.S.C. § 1204 on or after March 11, 1997 and should be held for further proceedings.